# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

ERIC HODKIEWICZ,

      Petitioner,

v.                             Case No. 18-CV-900

REED RICHARDSON,

      Respondent.

## DECISION AND ORDER DENYING
## PETITION FOR WRIT OF HABEAS CORPUS

Eric Hodkiewicz, a prisoner in Wisconsin custody, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Habeas Pet., Docket # 1.) Hodkiewicz was convicted of nine felony and misdemeanor offenses, and sentenced to eight years of initial confinement and thirteen years of extended supervision. (*Id.* at 3.) Hodkiewicz contends that his conviction and sentence are unconstitutional. For the reasons stated below, the petition for writ of habeas corpus will be denied and the case dismissed.

## BACKGROUND

Hodkiewicz's convictions arose from allegations that he stalked, harassed, and repeatedly assaulted his now ex-wife, S.P., during their acrimonious divorce and child custody proceedings. (*Wisconsin v. Hodkiewicz*, 2016AP359 (Wis. Ct. App. July 18, 2017), Docket # 1-2 ¶ 1). At trial in March 2014, Hodkiewicz faced nine charges: (1) stalking, as a party to a crime between May 2010 and January 2013; (2) unlawful use of a telephone, as a domestic abuse repeater, on August 10, 2012; (3) disorderly conduct, as a domestic abuse repeater, on August 6, 2012; (4) criminal damage to property, as a domestic abuse repeater,

on November 5, 2012; and on the evening of July 1–2, 2013, all of the following: (5) burglary of a building or dwelling; (6) substantial battery—domestic abuse, as a domestic abuse repeater; (7) strangulation and suffocation—domestic abuse, as a domestic abuse repeater; (8) disorderly conduct—domestic abuse, as a domestic abuse repeater; and (9) bail jumping. (*Id.* ¶ 3.)

At trial, the prosecution's theory was that Hodkiewicz was a careful manipulator who harassed and repeatedly assaulted S.P. while methodically concealing his activities. (Trial Day 1 Tr. 184–212, Docket # 14-8.) The defense relied primarily on the lack of eyewitnesses or physical evidence linking Hodkiewicz to the crimes, suggesting that disagreements over their infant son motivated S.P. to fabricate these allegations against Hodkiewicz. (Trial Day 1 Tr. 214–22, Docket # 14-8.) After a six-day trial, the jury convicted Hodkiewicz on all counts. (Docket # 14-8 to Docket # 14-18.) The facts as summarized by the court of appeals are as follows, with additional information and citations to the record as relevant.

S.P. testified that she and Hodkiewicz were married and living together at a residence on Weed Street in Shawano in May 2010. (Docket # 1-2 ¶ 4.) S.P. was eight months pregnant and had suffered preeclampsia, which required her to remain on bed rest for much of the pregnancy. (*Id.*; Trial Day 2 Tr. 17, Docket # 14-9.) S.P. claimed that on May 13, 2010, Hodkiewicz pushed her down and rubbed her face against a wall. (Docket # 1-2 ¶ 4.) S.P. testified she did not immediately report this to police because she was afraid and did not want Hodkiewicz to get into trouble. (*Id.*) However, she told Hodkiewicz to leave and not come back. (*Id.*) Hodkiewicz left, but he returned several times during the following week. (*Id.*) As a result, on May 20, 2010, S.P. reported the May 13 incident to police. (*Id.*) Hodkiewicz denied hitting or pushing S.P. on May 13, 2010. (*Id.* ¶ 6.) However, he admitted grabbing her

wrist and "kind of pulling back and forth" in an attempt to get his phone and pager, which he claimed S.P. had taken from him.[1] (*Id.*) S.P. testified that, on a subsequent occasion in May 2010, Hodkiewicz pushed her down the stairs. (*Id.* ¶ 5.) On May 24, 2010, Hodkiewicz filed for divorce. (*Id.* ¶ 4.)

S.P. also testified regarding an incident on May 27, 2010, in which Hodkiewicz returned to the residence and chased her into a bathroom. (Docket # 1-2 ¶ 5.) A struggle ensued, during which Hodkiewicz pushed S.P., causing her to hit her head on the sink. (*Id.*) S.P. testified she was knocked unconscious, and regained consciousness when her mother found her lying on the bathroom floor. (Trial Day 2 Tr. 23–28, Docket # 14-9.) Several witnesses testified about responding to aid S.P. (Testimony of Karen P., Trial Day 3 part 1 Tr. 74–80, Docket # 14-10; Testimony of Jeff Lenzer, Trial Day 3 Tr. 112–16, Docket # 14-10.) S.P. testified that when she went to the emergency room, medical staff questioned her about her injuries, apparently suspicious of her story that she fell down the stairs, and the admitting nurse gave her a "safe word" to say if she had concerns for her safety. (Trial Day 2 Tr. 29–33, Docket # 14-9.) The on-call OB/Gyn, Dr. Halloin, testified that S.P. told him she had been dizzy and fallen; Dr. Halloin testified that preeclampsia does not usually cause fainting. (Trial Day 3 part 1 Tr. 7–24, Docket # 14-10.) Hodkiewicz denied having any contact with S.P. on May 27, 2010. (Docket # 1-2 ¶ 6.)

The couple's son J. was born via emergency c-section on May 28, 2010. (*Id.*) Dr. Halloin testified that it was clear the relationship between S.P. and Hodkiewicz was not good, and that during a conversation with Hodkiewicz outside the delivery room, Hodkiewicz asked

---

[1] Hodkiewicz eventually pleaded no contest to two counts of disorderly conduct with domestic abuse enhancers for these early events. He was given a deferred prosecution agreement, required to attend domestic violence courses, and put on probation in 2012.

about a paternity test for the baby. (*Id.*) Dr. Halloin testified that at the six-week postpartum visit, S.P. told Dr. Halloin that her bruising had been caused by Hodkiewicz. (*Id.*) Dr. Halloin dictated a letter for S.P.'s file, noting that S.P. said she was hit and was very upset about the relationship. (*Id.*) Dr. Halloin explained that in his experience, victims of domestic violence often do not disclose it, at least initially. (*Id.*) Dr. Halloin testified that S.P. appeared to have already reported the incident to police. (*Id.*)

After J.'s birth, S.P. allowed Hodkiewicz to stay at the Weed Street residence at times and permitted him to spend time with J. (Docket # 1-2 ¶ 7.) S.P. testified that Hodkiewicz came to the residence on August 9, 2010, but when S.P. told him it was not "a good time" for a visit, he became "angry and upset." (*Id.*) Sometime after Hodkiewicz left, S.P. observed a large cut in the side of an above-ground, rubber-sided swimming pool in the yard. (*Id.*) Two others testified that they saw the slashed pool: Jed Reinke, who was the father of S.P.'s older son, and a Shawano police officer. (Testimony of Jed Reinke, Trial Day 3 part 1 Tr. 178–80, Docket # 14-10; Testimony of Daniel Conradt, Trial Day 3 part 1 Tr. 41–48, Docket # 14-10.) Hodkiewicz denied involvement (Docket # 1-2 ¶ 7), and an investigation found no evidence connecting the pool slashing to Hodkiewicz (Testimony of Daniel Conradt, Trial Day 3 part 1 Tr. 46–47, Docket # 14-10).

During the same time period, S.P. testified she found a dead rabbit on her doorstep. (Docket # 1-2 ¶ 7.) S.P. also complained to police that Hodkiewicz would drive by periodically, and that he carried a tape recorder with him. (Testimony of Daniel Conradt, Trial Day 3 part 1 Tr. 43, Docket # 14-10.) Hodkiewicz testified that he knew nothing of the dead rabbit but admitted that he carried a voice recorder on the advice of his attorney and law enforcement. (Trial Day 5 Tr. 103–04, Docket # 14-16.)

On September 1, 2010, S.P. found an insult keyed into the door of her vehicle. (Docket # 1-2 ¶ 7.) S.P. testified the vehicle was in a locked garage, and that Hodkiewicz had a key and a garage door opener. (Trial Day 2 Tr. 38–39, Docket # 14-9.) S.P.'s father testified that he saw the insult in S.P.'s car door, and saw a garage door opener on the visor of Hodkiewicz's vehicle. (Testimony of David P., Trial Day 1 Tr. 227–33, Docket # 14-8.) The officer who responded testified that he found no evidence linking this incident to Hodkiewicz, and did not retrieve the garage door opener reportedly in Hodkiewicz's truck. (Testimony of Ryan Atkinson, Trial Day 3 Tr. 31–40, Docket # 14-10.)

Several days later, S.P. found a red liquid in her dog's dish, which her father believed to be antifreeze. (Docket # 1-2 ¶ 7.) She approached Hodkiewicz about it, and he told her not to worry because it was not the toxic kind of antifreeze, a level of knowledge that concerned her. (Trial Day 2 Tr. 40–41, Docket # 14-9.) Hodkiewicz denied involvement (Docket # 1-2 ¶ 7) and testified that he only happened to know that green antifreeze was toxic while red was not (Trial Day 5 Tr. 93–95, Docket # 14-16).

In spring 2011, Hodkiewicz moved to the marital home and S.P. moved to a home in the village of Pulaski, but still in Shawano County. (Docket # 1-2 ¶ 8; Testimony of S.P., Trial Day 2 Tr. 45, Docket # 14-9.) In September 2011, S.P. testified that she found the body of a stray cat hanging from a tree outside her home. (Docket # 1-2 ¶ 8.) Around the same time, S.P. testified that she found a "pretty big pile of animal guts" in her driveway. (*Id.*) Again, Hodkiewicz denied involvement in these incidents. (*Id.*)

S.P. further testified that, on the evening of December 9, 2011, she was home alone and went to her garage to take out some recycling. (Docket # 1-2 ¶ 9.) While there, she was struck on the head, which caused her to fall and hit her chin on the cement floor. (*Id.*) When

she tried to get up, someone struck or kicked her leg. (*Id.*) While she was on the floor, S.P. heard Hodkiewicz say that she was crazy, that she should not have J., and that she should call the police because they also thought she was crazy. (*Id.*) S.P. testified that when her assailant left, she called her mother, and they went to the emergency room. (Trial Day 2 Tr. 58–59, Docket # 14-9.) The emergency room doctor, Dr. Zifferblatt, testified that S.P. said she had been assaulted by her husband and she thought she had been hit by shovel, but she refused to report the incident to police despite encouragement from himself and the nurses. (Testimony of Jocko Zifferblatt, Trial Day 3 Tr. 25–30, Docket # 14-10.) S.P. testified that she talked to a domestic violence shelter, Safe Haven, and reported the December 9 incident to police a few days after it happened. (Trial Day 2 Tr. 60–61, Docket # 14-9.) Police collected a snow shovel from the scene and took a picture showing how S.P.'s injuries fit the handle of the snow shovel. (Testimony of Troy Ugoretz, Trial Day 3 part 1 Tr. 163–72, Docket # 14-10.) A DNA swab on the shovel revealed no identifiable DNA. (Testimony of Randal Dunford, Trial Day 4 part 2 Tr. 14–17, Docket # 14-13.)

Hodkiewicz denied striking or otherwise harming S.P. on December 9, 2011. (Docket # 1-2 ¶ 10.) It was undisputed that Hodkiewicz had placement of J. that night. (*Id.*) In addition, Hodkiewicz's neighbor, Kyle Thorson, testified that he heard Hodkiewicz's garage door open sometime between 7:30 and 8:00 p.m. that evening, "so [he] knew [Hodkiewicz] was backing his truck in." (*Id.*) Thorson testified that he texted Hodkiewicz and then went over to Hodkiewicz's garage sometime between 8:00 and 8:30 p.m., and they talked for sixty to ninety minutes. (*Id.*)

On January 26, 2012, Hodkiewicz was placed on probation for the May 2010 disorderly conduct convictions. (Testimony of Julie Krause, Trial Day 2 Tr. 232–56, Docket

# 14-9.) His probation officer, Julie Krause, testified that she encouraged S.P. to call her and that she developed a rapport with S.P., who called up to 150 times during Hodkiewicz's one-year probation. (*Id.*) Krause testified that Hodkiewicz was returned to custody six times during his probation, most of which were in response to information from S.P. (*Id.*) Krause stated that Hodkiewicz was put on a proximity monitor in part at Hodkiewicz's request. (*Id.*)

S.P. testified that in January 2012 she found an anonymous note inside her mailbox that said "u r dun," and on another occasion during the same time frame she found a live cat inside her mailbox. (Docket # 1-2 ¶ 11.) Around that time, her dog went missing and was found thirty miles away. (*Id.*) On February 1, 2012, S.P. discovered garden shears stuck into the driver's seat of her vehicle and a meat fork stuck into J.'s car seat. (*Id.*) A Shawano County deputy testified that he was unsuccessful in finding any fingerprints on either item, opining that they could have been wiped down or the perpetrator could have worn gloves. (Testimony of James Hauer, Trial Day 2 Tr. 217–18, Docket # 14-9.) Hodkiewicz denied involvement in these incidents. (Docket # 1-2 ¶ 11.)

In March 2012, S.P. moved in with her parents. (*Id.* ¶ 12.) She testified that at that time she began a new job and obtained a new phone number that she did not give to Hodkiewicz. (Testimony of S.P., Trial Day 2 Tr. 76–77, Docket # 14-9.) In late spring and into summer of 2012, S.P. received a large number of calls on her phone from a restricted or unknown number. (*Id.* Tr. 76–81.) At some point, S.P. began to answer the calls in an attempt to determine who was making them. (Docket # 1-2 ¶ 23.) On July 13 and July 20, 2012, the caller made insulting remarks and S.P. recognized the caller's voice as Hodkiewicz's. (*Id.*) In a July 27, 2012 call, the caller made insulting comments but S.P. testified she could not identify the caller's voice because she was at work and it was difficult to hear. (*Id.*) Also in

July 2012, S.P. received an insulting text message with the letter "u" in place of "you." (*Id.*) A Shawano County deputy testified that S.P. reported the phone calls in July 2012 and showed him her call log with numerous calls from unknown or restricted numbers. (Testimony of James Hauer, Trial Day 2 Tr. 217–18, Docket # 14-9.)

In late July 2012, S.P. moved from her parents' home to an apartment in Brown County. (Docket # 1-2 ¶ 14.) She reported the continuing phone calls to Pulaski police in August 2012. (Testimony of Mark Hendzel, Trial Day 4 Tr. 4, Docket # 14-15.) Officer Hendzel, a Pulaski Police Department investigator, testified that S.P. appeared intimidated and said she felt harassed and threatened. (*Id.* Tr. 6–7.) Hendzel also testified that the phone records he subpoenaed and reviewed corroborated S.P.'s account of the calls from "unknown" or "restricted" numbers. (*Id.* Tr. 75.) Hendzel explained that police traced some of the harassing phone calls and texts to a specific TracFone. (Docket # 1-2 ¶ 13.) The activation number for the TracFone was the general number for Little Rapids Paper Corporation, where Hodkiewicz worked. (Testimony of Mark Hendzel, Trial Day 4 Tr. 11–13, Docket # 14-15.) Hodkiewicz denied activating or using the TracFone that was used to call and text S.P. (Docket # 1-2 ¶ 14.) Moreover, Hodkiewicz was in custody at the Shawano County Jail on a probation hold on May 12, 2012, the date the TracFone was activated. (*Id.*)

S.P. testified that she did not tell people other than her parents that she was moving to an apartment in Brown County at the end of July, 2012. (Testimony of S.P., Trial Day 2 Tr. 81-82.) On August 6, 2012, she found some flowers outside the door. (Docket # 1-2 ¶ 14.) S.P. testified she "assumed that somebody either left [the flowers] in the wrong spot or they were . . . from the apartment complex." (*Id.*) However, on August 10, 2012, she received a phone call in which the caller asked, "Did you get them?" (*Id.*) When S.P. did not respond,

the caller said, "[Y]ou did," and then laughed. (*Id.*) S.P. testified she recognized the caller as Hodkiewicz. (*Id.*) Hodkiewicz denied delivering flowers to S.P. or calling her on August 10, 2012. (*Id.*) S.P. testified that on September 26, 2012, she found flowers on the outdoor balcony of her second-floor apartment. (Docket # 1-2 ¶ 15.) A DNA swab on the second set of flowers was negative for Hodkiewicz. (Testimony of Randal Dunford, Trial Day 4 part 2 Tr. 14–17, Docket # 14-13.)

In early October 2012, law enforcement searched Hodkiewicz's house for the TracFone and did not find it, though they found multiple other phones at the residence. (Testimony of Randal Dunford, Trial Day 4 part 2 Tr. 22–24, Docket # 14-13; Testimony of Mark Hendzel, Trial Day 4 part 4 Tr. 17–22, Docket # 14-15.) Officers also interviewed Hodkiewicz twice, and he denied involvement in the phone calls. (Testimony of Mark Hendzel, Trial Day 4 part 4 Tr. 23, Docket # 14-15.) On November 5, 2012, S.P. found an insult scratched into the driver's side door of her vehicle, using a lowercase "u" in place of "you." (*Id.*)

In May 2013, Hodkiewicz had been charged with stalking, placed on probation, and told to have no contact with S.P. Police had installed a VARDA alarm in S.P.'s apartment, placing it up high in the kitchen to keep it away from children. (Testimony of S.P., Trial Day 2 Tr. 91–92.) In May 2013, S.P. believed she saw Hodkiewicz driving hear her home, and in June 2013, she reported that the rearview mirror on her car was damaged and saw a vehicle registered to Hodkiewicz's father near her residence. (*Id.* Tr. 92–93.) Hodkiewicz denied involvement with the rearview mirror (Trial Day 5 Tr. 129, Docket # 14-16), and DNA testing on the rearview mirror was negative for Hodkiewicz (Testimony of Randal Dunford, Trial Day 4 part 2 Tr. 27, Docket # 14–13).

On the night of July 1–2, 2013, J. was staying with Hodkiewicz at Hodkiewicz's parents' residence. (*Id.* ¶ 16.) S.P. testified she fell asleep on the couch in her apartment at around 10:30 p.m. (*Id.*) She had taken Percocet because she was recovering from hand surgery, and she admitted the events of that evening were somewhat "fuzzy." (*Id.*) She fell asleep sucking on a lollipop to ease the nausea caused by the pain medication. (Trial Day 2 Tr. 96, Docket # 14-9.) At some point, S.P. woke up and went into the bathroom. (Docket # 1-2 ¶ 16.) As she turned on the bathroom light, she felt something—possibly a rubber tube— being wrapped around her neck. (*Id.*) She also felt something over her mouth that "tasted like powder" or latex. (*Id.*) A struggle ensued, during which S.P. testified she saw Hodkiewicz's reflection in the bathroom mirror. (*Id.*) S.P. lost consciousness and later woke up lying on the bathroom floor, naked from the waist down. (*Id.*). The lollipop was on the floor, with parts of it stuck in her hair, and the bathroom door was damaged. (Trial Day 2 Tr. 107–08, Docket # 14-9.)

S.P. testified that she left the bathroom to retrieve her phone, locked herself in the bathroom, and called her mother, then Reinke, then 9-1-1. (*Id.* Tr. 105–06.) She was taken to St. Mary's hospital, then transferred to St. Vincent's for a SANE (sexual assault) exam. (*Id.* at 110.) The SANE nurse, Larraine Borroughs, testified about the exam she performed on S.P. (Trial Day 3 part 2 Tr. 3–20, Docket # 14-11; Trial Day 4 part 1 Tr. 18–35, Docket # 14-12.) DNA testing on the SANE kit was negative for Hodkiewicz. (Testimony of Randal Dunford, Trial Day 4 Tr. 16–17, Docket # 14-13.)

Law enforcement attempted unsuccessfully to locate Hodkiewicz after the assault on S.P. (Testimony of James Hauer, Trial Day 2 Tr. 212–25, Docket # 14-9.) Between 4:00 a.m. and 8:00 a.m., an officer drove by Hodkiewicz's parents' house repeatedly, as well as the

former marital home and Hodkiewicz's workplace, and did not see Hodkiewicz's truck at any location. (*Id.*) Officers took S.P.'s entire bathroom door for testing and found only S.P.'s DNA on it. (Testimony of Randal Dunford, Trial Day 4 Tr. 17, Docket # 14-13.)

Hodkiewicz testified he was at his parents' home with J. on the night of July 1–2, 2013. (Docket # 1-2 ¶ 17.) Hodkiewicz's mother testified she saw Hodkiewicz go to bed at about 9:30 p.m. on July 1, and she next saw him at 6:40 a.m. the following morning. (*Id.*) She did not hear Hodkiewicz leave the house during the night. (*Id.*) Hodkiewicz's father testified he returned home from a meeting at 10:20 p.m. on July 1 and saw Hodkiewicz's truck parked near the family's home. (*Id.*) He testified he did not hear Hodkiewicz leave the house until 5:00 a.m. the next morning. (*Id.*)

The manager of S.P.'s apartment complex testified that, although it was difficult, it was possible to access second-floor balconies using furniture on patios beneath, and there was furniture beneath S.P.'s balcony. (Testimony of Peggy Campbell, Trial Day 2 Tr. 225–31, Docket # 14-9.) Pulaski Police Chief Randal Dunford testified about photos he took of S.P.'s balcony as well as a "patio set" and a dented air conditioning unit below the balcony. (Testimony of Randal Dunford, Trial Day 4 Tr. 7–11, Docket # 14-13.)

In its closing argument, the prosecution described Hodkiewicz as "careful" and "methodical," and pointed to evidence that corroborated S.P.'s claims: the physical injuries, the shovel that lined up perfectly with the injury to her face, the notes, the insults scratched in the car, the phone records, the gardening shears and meat fork stuck in the car seats, the linear marks on her neck and the sucker on the floor, the dent in the air conditioning unit underneath S.P.'s balcony, etc. (Trial Day 6 part 1 Tr. 148–75, 201–20, Docket # 14-17.) The defense argued that while it did not dispute that S.P. had been injured, there was no evidence

linking those injuries or any of the other alleged crimes to Hodkiewicz. (*Id.* Tr. 175–201.) After deliberating for under five hours, the jury returned a verdict of guilty on all counts. (*Id.* Tr. 230–31.)

Shortly after trial, counsel for Hodkiewicz filed a motion for judgment notwithstanding the verdict based on insufficiency of the evidence, and for a new trial based on court errors. (Docket # 12-7.) After a hearing on the motion, the circuit court denied it. (Docket # 12-8.)

Hodkiewicz moved for post-conviction relief with eleven distinct arguments, including those he raises in this petition. (Docket # 14-1.) The circuit court held three evidentiary hearings before denying the motion in its entirety, with the exception of correcting an error in calculating Hodkiewicz's sentence. (Docket # 14-20, Docket # 14-21, Docket # 14-22, Docket # 10-4 at 60–87.) The court of appeals reversed Hodkiewicz's convictions on Counts 2 and 3 related to the August 2010 incident with the flowers and phone call[2] (Docket # 1-2 ¶¶ 36–43), but otherwise affirmed the denial of Hodkiewicz's post-conviction motion (Docket # 1-2). Hodkiewicz timely filed a petition for a writ of habeas corpus in this court. (Docket # 1.)

## STANDARD OF REVIEW

Hodkiewicz's petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, a writ of habeas corpus may be granted if the state court decision on the merits of the petitioner's claim (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "was based on an unreasonable

---

[2] Because Hodkiewicz's convictions on Counts 2 and 3 were reversed, Hodkiewicz's petition is moot as to those counts.

determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

A state court's decision is "contrary to . . . clearly established Federal law as established by the United States Supreme Court" if it is "substantially different from relevant [Supreme Court] precedent." *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). The court of appeals for this circuit recognized the narrow application of the "contrary to" clause:

> [U]nder the "contrary to" clause of § 2254(d)(1), [a court] could grant a writ of habeas corpus . . . where the state court applied a rule that contradicts the governing law as expounded in Supreme Court cases or where the state court confronts facts materially indistinguishable from a Supreme Court case and nevertheless arrives at a different result.

*Washington*, 219 F.3d at 628. The court further explained that the "unreasonable application of" clause was broader and "allows a federal habeas court to grant habeas relief whenever the state court 'unreasonably applied [a clearly established] principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*, 529 U.S. at 413).

To be unreasonable, a state court ruling must be more than simply "erroneous" and perhaps more than "clearly erroneous." *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997). Under the "unreasonableness" standard, a state court's decision will stand "if it is one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 748–49 (7th Cir. 1997). In *Morgan v. Krenke*, the court explained that:

> Unreasonableness is judged by an objective standard, and under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

232 F.3d 562, 565–66 (7th Cir. 2000) (quoting *Williams*, 529 U.S. at 411), *cert. denied*, 532 U.S.

951 (2001). Accordingly, before a court may issue a writ of habeas corpus, it must determine that the state court decision was both incorrect and unreasonable. *Washington*, 219 F.3d at 627.

Habeas relief is available only for state court decisions that are contrary to federal law. This court may not review whether a state court properly applied its own state laws. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

## ANALYSIS

Hodkiewicz argues that he is entitled to a writ of habeas corpus due to (1) violation of the Confrontation Clause by the use of hearsay evidence (Docket # 1 at 7, Docket # 1-1 at 5–7, Docket # 15 at 12–14); (2) violation of due process by the use of testimony the State knew or should have known was false (Docket # 1 at 8, Docket # 1-1 at 7–10, Docket # 15 at 14–21); (3) ineffective assistance of trial counsel for failing to object to the hearsay/confrontation violation, object or respond to the State's false evidence, or properly respond to other misleading testimony (Docket # 1 at 9, Docket # 1-1 at 10–13, Docket # 15 at 21–36); and (4) violation of the Double Jeopardy Clause by conviction and sentencing for both bail jumping and strangulation (Docket # 1 at 10, Docket # 15 at 36–39).

*1.     Procedural Default*

Respondents argue that Hodkiewicz forfeited his confrontation, due process, and double jeopardy challenges by not objecting on those grounds at trial. (Docket # 18 at 14.) Hodkiewicz replies that these claims are not forfeited because the court of appeals did not actually rely on procedural default to deny his claims. (Docket # 20 at 2–3.)

A federal court may not review a question of federal law decided by a state court if the

14

decision of the state court rests on a state procedural ground that is independent of the federal question and adequate to support the judgment. *Moore v. Bryant*, 295 F.3d 771, 774 (7th Cir. 2002). The independent and adequate state ground doctrine "applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Id.* (internal quotation and citation omitted). To conclude that a petitioner has procedurally defaulted a claim due to an adequate and independent state ground, this Court "must be convinced that the last state court to consider the question actually relied" on a procedural ground "as the basis for its decision." *Braun v. Powell*, 227 F.3d 908, 912 (7th Cir. 2000) (internal citations omitted). The state court's reliance on a procedural rule therefore must be explicit. *See id.* Furthermore, "the state's procedural rule must be both 'firmly established and regularly followed,'" applied consistently and frequently, and will not be an adequate ground for procedural default "if the prisoner 'could not fairly be deemed to have been apprised of its existence' at the time [he] acted." *Id.* (internal citations omitted).

Procedural default may be overcome by a showing of "cause" excusing the default and resulting "prejudice." *Rodriguez v. Young*, 906 F.2d 1153, 1158–59 (7th Cir. 1990) (citing *Wainwright v. Sykes*, 433 U.S. 72 (1977)). In some cases, ineffective assistance of counsel may excuse the default if the ineffectiveness rises to the level of a constitutional deprivation. *Id.* at 1159. Additionally, procedural default may be overcome in certain cases where there would otherwise be a deprivation of due process resulting in a fundamental miscarriage of justice. *Id.* at 1159 (citing *Murray v. Carrier*, 477 U.S. 478 (1986)).

The court of appeals found that because Hodkiewicz had not objected to the admission of hearsay evidence and allegedly false evidence at trial, he had waived those stand-alone

constitutional claims. (Docket # 1-2 ¶¶ 20, 48.) Thus, I conclude that Hodkiewicz's Ground One and Two challenges are barred by an independent and adequate state procedural ground. Additionally, Hodkiewicz has not shown cause for and prejudice to excuse the procedural default.

In contrast, the court of appeals did not invoke an independent and adequate state procedural ground in its decision on Hodkiewicz's double jeopardy claim. Instead, the court found that, as Hodkiewicz conceded, the claim was contrary to controlling precedent. (*Id.* ¶ 65.) Because the court of appeals reached the merits of Hodkiewicz's double jeopardy claim, albeit briefly, it is not procedurally barred and will be addressed below.

### 2. Ground Three: Ineffective Assistance of Counsel

Hodkiewicz's Ground Three claims that trial counsel rendered constitutionally ineffective assistance by failing to object or properly respond to testimony that was hearsay, false, and/or misleading. (Docket # 1 at 9, Docket # 1-1 at 10–13.)

The clearly established Supreme Court precedent for ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance of counsel, Hodkiewicz must show both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Id.* at 687. To satisfy *Strickland's* performance prong, the defendant must identify "acts or omissions of counsel that could not be the result of professional judgment." *United States ex rel. Thomas v. O'Leary*, 856 F.2d 1011, 1015 (7th Cir. 1988) (citing *Strickland*, 466 U.S. at 690). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (quoting *Strickland*, 466 U.S. at 689). A reviewing court must seek to "evaluate the

conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. We "must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance," *id.*, and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *id.* at 690.

To establish prejudice, it is "not enough for the defendant to show that his counsel's errors had some conceivable effect on the outcome of the [trial]." *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001). A petitioner must show "that there is a reasonable probability that, but for counsel's errors, the result of the [trial] would have been different." *Strickland*, 466 U.S. at 694. This does not mean that the defendant must show that "counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. Rather, a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Making this probability determination requires consideration of the totality of the evidence before the jury. *Id.* at 695. A "verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696. Additionally, under Seventh Circuit precedent, a petitioner may demonstrate that the cumulative effect of counsel's individual acts or omissions was substantial enough to meet *Strickland*'s prejudice test. *Williams v. Washington*, 59 F.3d 673, 682 (7th Cir. 1995) (citing *United States ex rel. Kleba v. McGinnis*, 796 F.2d 947, 958 (7th Cir. 1986); *Montgomery v. Petersen*, 846 F.2d 407, 412 (7th Cir. 1988)).

A court deciding an ineffective assistance claim need not approach the inquiry "in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result

of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." *Id.*

### 2.1.    *TracFone Activation Testimony*

The State sought to prove that Hodkiewicz made a series of harassing phone calls to S.P. using a certain TracFone. The records of this TracFone showed 146 calls to S.P. in a two-month period in 2012, and no calls to anyone else. Undisputed evidence showed that the "activation number" for the TracFone was the number for Little Rapids Paper Corporation, where Hodkiewicz worked. Hodkiewicz had previously given the same number to his probation agent as a contact number. There was one glitch in the State's narrative, however: On the day the TracFone had been activated—May 12, 2012—and on dates when at least seventeen of the calls to S.P. were placed, Hodkiewicz was in custody in the Shawano County Jail. He was not at work on May 12, 2012 so he could not have activated the phone from work, and the only phone calls he should have been able to make while in custody should have been on the jail's recorded line.

In this context, Hodkiewicz criticizes counsel's failure to object to Officer Hendzel's testimony that a TracFone technical support provider told him that the "activation number" is not necessarily the number the activator is calling from; in other words, a TracFone may be remotely activated. Hendzel testified as follows:

Q:    And a TracFone, are you familiar with TracFone?
A:    I am.
Q:    Based upon your training and experience in investigation, have you also
      spoken to support, technical support with TracFone?

18

| A: | I have. |
|---|---|
| Q: | Now, with respect to your training and experience, are you familiar with respect to what the significance is of an activating number with regard to a TracFone? |
| A: | It's just a secondary number that they're required during the activation process. |
| Q: | So when it is indicated that there is actually a number that a TracFone is activated from, that's not the number, necessarily, that someone's physically at; is that correct? |
| A: | That is what I have learned, yes. |
| Q: | And that's what you're aware of? |
| A: | Correct. |
| Q: | And with respect to that, when I'm talking about whether somebody is physically at a number, it's something that can be remotely activated; is that right? |
| A: | Correct. |
| Q: | So one person can activate a TracFone from another location, but still put an activating number they're not at? |
| A: | Correct. |

(Docket # 14-15 at 14–15.)

The court of appeals concluded that Hodkiewicz was not prejudiced by counsel's failure to object to this testimony because other strong evidence linked Hodkiewicz to the phone calls. (Docket # 1-2 ¶¶ 24–25, 29.) I agree. The prosecution portrayed Hodkiewicz as a careful manipulator who skillfully evaded detection, and the jury evidently believed it. It seems unlikely, then, that uncertainty about how Hodkiewicz activated a TracFone from jail would have planted serious doubt in the jury's mind that Hodkiewicz used the TracFone to harass S.P. Therefore, Hodkiewicz is not entitled to habeas relief on this claim.

### 2.2. *"Special Privileges" Testimony*

After defense counsel questioned Hendzel about the fact that Hodkiewicz was in the Shawano County Jail on the date the TracFone was activated, the State elicited the following testimony on redirect:

| Q: | Officer Hendzel, at the time Eric Hodkiewicz had been at the Shawano County Jail, did you actually, as part of this investigation, receive some |

| | information that he had access to phones in the jail? |
|---|---|
| A: | I had received information that he had a person that was related to him working in the jail. |
| Q: | And let's run through that. Doesn't he have a relative, a Sarah Hodkiewicz? |
| A: | Apparently that's the name, yes. |
| Q: | And are you also aware of a Sam Williams Krueger being a relative of his working in the jail? |
| A: | There's a Krueger. I can't remember the full name of some people, but yes, there was a Krueger that worked in the jail. |
| Q: | And a Troy Beyer, who's actually the shift commander for the jail in the evening shift, a third cousin of Eric Hodkiewicz? |
| A: | I have been made aware of it. |
| Q: | So there was information that Eric Hodkiewicz had actually had family members working in the jail supplying him with some special privileges; isn't that true? |
| A: | True. |
| Q: | Including getting out of his cell and having access to phones? |
| A: | Correct. |

(Testimony of Mark Hendzel, Trial Day 4 Tr. 70–71, Docket # 14-15.) As with the activation number testimony, Hodkiewicz argues that counsel ought to have objected because this was hearsay that violated his right to confront witnesses against him. (Docket # 15 at 23.)

The court of appeals rejected Hodkiewicz's claim, finding that even if the testimony was inadmissible hearsay, there was no prejudice. (Docket # 1-2 ¶ 35.) The court explained that other testimony undermined Hendzel's "special privileges" testimony, including: Henzel testified that it would have been criminal for any jail employee to give Hodkiewicz special treatment, that he had not investigated whether Hodkiewicz received special treatment, and that he had no personal knowledge as to whether Hodkiewicz had access to a phone in jail; Hodkiewicz denied in his trial testimony that he had access to a phone in jail; and Hodkiewicz's trial attorney had emphasized in his closing argument the lack of evidence that Hodkiewicz received special treatment in jail. (*Id.* ¶ 31.) Additionally, the court of appeals explained that this testimony would not have affected the verdict on Counts 2 through 9

because those counts were unrelated to any phone calls S.P. allegedly received while Hodkiewicz was in jail, or on Count 1 (the stalking charge) because even without considering any of the phone calls, there was ample evidence for the jury to find Hodkiewicz guilty of stalking. (*Id.* ¶¶ 31–34.)

As with the activation number testimony, I find the court of appeals' conclusion that there was no prejudice to be reasonable. In addition to the reasons stated by the court of appeals, even if counsel had objected and the jury had not considered Hendzel's testimony, the jury still could have considered Hodkiewicz's own admission that he had at least three relatives who worked at the Shawano County Jail while he was in custody there. (Docket # 12-18 at 21–22.) The jury did not need Hendzel's testimony to infer that relatives might have helped Hodkiewicz in jail; it was an obvious inference. While perhaps Hendzel's testimony gave this narrative additional weight, it appears extremely unlikely that an objection would have led to Hodkiewicz's acquittal on the stalking charge. Because the court of appeals' conclusion that counsel's failure to object did not prejudice Hodkiewicz was not contrary to or an unreasonable application of *Strickland*, Hodkiewicz is not entitled to habeas relief on this claim.

### 2.3. "Work Phone" Testimony

The court of appeals agreed with Hodkiewicz that counsel was deficient for failing to object to Hendzel's hearsay testimony that S.P. told him she received the August 10, 2010 call on her work phone rather than her cell phone, and that this prejudiced him on Counts 2 and 3. (Docket # 1-2 at ¶¶ 36–43.) However, the court of appeals explained that it found no prejudice on the other counts. (*Id.* n.7.)

Hodkiewicz argues that counsel's failure to object to Hendzel's work phone testimony

prejudiced him not only on Counts 2 and 3, but on the other counts as well. (Petitioner's Reply Br., Docket # 20 at 2.) Hodkiewicz asserts that because S.P.'s phone records showed only calls from Reinke on that day, then, but for Hendzel's testimony, the jury must have concluded that S.P.'s identification of Hodkiewicz's voice was either false or mistaken (Docket # 20 at 12–13), which would in turn have destroyed the credibility of *all* S.P.'s identifications of Hodkiewicz (*id.*; Docket # 15 at 34).

Although Hodkiewicz makes a compelling argument that counsel's failure was *relevant* to all the counts because of the effect of the testimony in bolstering S.P.'s credibility, the court of appeals' conclusion that he was not *prejudiced* was a reasonable one. The jury heard thirty-five witnesses, including both S.P. and Hodkiewicz, and examined ninety-two exhibits. It had many data points on which to base its determination of S.P.'s credibility. In that context, it was reasonable for the court of appeals to conclude that even if counsel's objection might have saved Hodkiewicz on the two counts that relied on the jury finding that Hodkiewicz made that phone call, there is not a reasonable likelihood that counsel's objection to this one piece of testimony would have so changed the jury's credibility determination that they would have acquitted Hodkiewicz on all the other counts.

### 2.4. False Testimony

Hodkiewicz argues that counsel's failure to respond appropriately to certain evidence that counsel knew or should have known to be false constituted ineffective assistance of counsel. (Docket # 15 at 24.) In addition to Hendzel's allegedly false testimony that S.P. received the August 10 call on her work phone rather than her cell phone, discussed above, Hodkiewicz points to Hendzel's testimony that Hodkiewicz admitted telling his coworkers that he would be better off if S.P. were "underground," i.e. dead. (*Id.*)

In cross-examining Hodkiewicz, the prosecution asked him whether, in his interview with Hendzel in October 2012, he had admitted saying something to his coworkers about his life being easier if S.P. were "under the ground, referring to her being dead." (Trial Day 6 part 1 Tr. 36–39, Docket # 14-17.) Hodkiewicz repeatedly denied that he admitted making such a comment. (*Id.*) In rebuttal on the last day of trial, the prosecution brought Hendzel back to testify about this alleged statement, as follows:

> Q: And at some point when you were speaking with Mr. Hodkiewicz, was there a discussion about whether or not he had indicated that he would be better off if [S.P.] were underground?
> A: He stated he may have said that to coworkers.
> Q: And with respect to that, did he initially deny saying it?
> A: Correct.
> Q: And after you questioned him further, did he admit to saying, but said it was a joke?
> A: He did.
> Q: And when you talked to him, he was admitting he said it; isn't that correct?
> A: Correct.
> Q: It wasn't that other people said it and he heard it. It was that he said it?
> A: Correct.

(Trial Day 6 part 2 Tr. 6, Docket # 14-18.) However, contrary to Hendzel's testimony, a video recording of the interview contains no such admission by Hodkiewicz. In fact, it shows Hodkiewicz's repeated denials. Hendzel's own report of the interview confirms this:

> I asked HODKIEWICZ if he remembered any conversation taking place when someone made the comment that life would be easier if [S.P.] was under the ground, referring to her being dead. HODKIEWICZ denied ever making such statement but admitted that this may have been said by co-workers, stated a second time that he never made such statements and said that this was nothing more than a joke. HODKIEWICZ stated that this type of statement may have been made. I asked HODKIEWICZ to be honest with me about the conversations. HODKIEWICZ said that this was nothing more than a joke.

(Docket # 14-1 at 17.)

The circuit court acknowledged that the recording of Hendzel's interview with

Hodkiewicz, and Hendzel's own report, support Hodkiewicz's assertion that he never admitted making such a statement. (Docket # 10-4 at 75.) The circuit court nevertheless concluded that Hendzel's testimony was not, in fact, false. It reasoned:

> The evidence set forth by Hodkiewicz here does *not* demonstrate that Investigator Hendzel lied about this statement, and therefore [counsel] was not deficient in failing to object to it as false testimony. . . . While Hodkiewicz may never have explicitly admitted that he did make such a statement to Investigator Hendzel, his answers to Investigator Hendzel's question about the alleged conversation clearly changed over the course of the conversation. This shift in Hodkiewicz's answers could reasonably have been construed as an admission by Investigator Hendzel, and thus his testimony was not false but merely indicative of what he remembered of his conversation with Hodkiewicz.

(Docket # 10-4 at 75–76.) The court of appeals upheld this finding as not clearly erroneous. (Docket # 1-2 ¶ 49.)

Hodkiewicz argues that the conclusion that Hendzel did not testify falsely is inexplicable, given that both the circuit court and the court of appeals acknowledged that Hodkiewicz did not admit making any such statement. (Docket # 15 at 19.) I agree. The testimony was false, and it was unreasonable of the state courts to find otherwise.

However, Hodkiewicz is nevertheless not entitled to habeas relief on this claim, because the court of appeals reasonably found that the testimony did not prejudice him. (Docket # 1-2 ¶ 50) Hendzel's "underground" testimony was only one of many pieces of evidence the prosecution cited as evidence of Hodkiewicz's motive and lack of credibility, including testimony that Hodkiewicz refused to take visitation so that he could take S.P. to court and have her found in contempt; testimony that Hodkiewicz indicated in domestic violence counseling that one of his goals was to crush his partner and take the child from her; testimony that Hodkiewicz requested a paternity test at the hospital when his child was born; testimony that Hodkiewicz failed to mention his supposed alibi for the shovel incident when

he made a timeline of events with Detective Wudtke; the fact that only a handful of TracFone calls were placed to S.P. on days Hodkiewicz was incarcerated, yet seventy-two were placed the day after he was released; Hodkiewicz's refusal to answer the question about which coworkers were commenting that he would be better off if S.P. were underground; Hodkiewicz's prior criminal convictions; Hodkiewicz's failure to admit to interviewing officers that he installed an unlawful water bypass at his home until he was confronted with evidence that proved it; Hodkiewicz's acknowledgement that he lied to an officer in May 2010 when he stated that he did not attack S.P.; testimony that Hodkiewicz could not complete his course of counseling for domestic violence or his probation; and testimony from several witnesses that Hodkiewicz displayed passive-aggressive, angry, and untruthful behavior. At the evidentiary hearing on the post-conviction motion, counsel for Hodkiewicz admitted that Hendzel's testimony was not helpful, but stopped far short of opining that it made any difference. (Docket # 14-20 at 39.) Rather, he stated that "[i]t just added insult to injury. More of the same of the types of things the State was asserting." (*Id.*)

In its final remarks, the prosecution juxtaposed all this evidence of Hodkiewicz's motive and lack of credibility with evidence of S.P.'s credibility, including: photo and medical verification of S.P.'s injuries and medical opinion that they could not have been self-inflicted; the match between S.P.'s injuries and her descriptions of the attacks; S.P.'s reluctance to report Hodkiewicz's alleged actions; S.P.'s waiver of the no-contact order so Hodkiewicz could attend their child's birth; S.P.'s admission that she could not always see or identify Hodkiewicz; and S.P.'s question to Langlois wondering "if I just give up my son, do you think this will stop?" (Trial Day 6 part 1 Tr. 201–220, Docket # 12-18.) The prosecution also reminded the jury of the need to consider S.P.'s demeanor in court and contrast it with

Hodkiewicz's in assessing their credibility. (*Id.*)

In sum, Hendzel's testimony came at the end of a lengthy trial and was offered as just one of many reasons to impute motive to Hodkiewicz and discount his credibility. The court of appeals' conclusion that Hendzel's testimony did not prejudice Hodkiewicz was therefore not contrary to or an unreasonable application of *Strickland*, and Hodkiewicz is not entitled to habeas relief on this claim.

### 2.5.    *Misleading Testimony*

At trial, Hodkiewicz's next-door neighbor, Kyle Thorson, testified that he spoke with Hodkiewicz in Hodkiewicz's garage for an hour to an hour and a half between approximately 8:00 p.m. and 10:00 p.m. (Trial Day 5 Tr. 14–22, Docket # 14-16.) On cross-examination of Hodkiewicz, the prosecution pressed Hodkiewicz on the fact that a timeline of his activities that day created by Detective Wudtke after a conversation with Hodkiewicz did not mention Thorson. (Docket # 14-16 at 47–48.) Hodkiewicz stated that he could not remember if he had told Wudtke about his conversation with Thorson. (*Id.*) On the last day of trial, the prosecution called Wudtke, who testified that if Hodkiewicz had mentioned it he would have put it in the timeline. (Trial Day 6 part 1 Tr. 63–65, Docket # 12-18.)

Hodkiewicz argues that counsel was ineffective for failing to rebut the inference from Wudtke's testimony that Hodkiewicz and Thorson fabricated the alibi. Hodkiewicz points out that trial counsel was aware of documents in discovery showing that both Hodkiewicz and Thorson had reported the conversation to police just three to four days after the incident and a month prior to Hodkiewicz's meeting with Wudtke, and argues that counsel was deficient for not using these prior statements to rebut the obvious inference from Wudtke's testimony. (Docket # 15 at 25.)

The court of appeals determined that any such failure did not prejudice Hodkiewicz. (Docket # 1-2 ¶¶ 54–56.) The court explained that the prior statements "do not provide anything remotely resembling an ironclad alibi." (*Id.* at ¶ 55.) The court of appeals noted that Hodkiewicz's statement was vague as to the timing of his interactions with Thorson, and even if the jury credited both statements, there was ample room in the timeline for Hodkiewicz to have committed the assault anyway. (*Id.*) The court also pointed out that these prior statements did not change the fact that Hodkiewicz failed to mention seeing Thorson when he was interviewed by Wudtke, and that Thorson's statement at trial that he began speaking with Hodkiewicz around 8:00 or 8:30 p.m. was inconsistent with his earlier statement to police that he went over to visit Hodkiewicz at about 10:00 p.m. (*Id.* ¶ 56.)

The court of appeals did not address Hodkiewicz's argument that counsel failed not only to protect Hodkiewicz's alibi, but to expose the state's attempts to mislead the jury. Hodkiewicz argues that "[b]ut for counsel's failure to correct the misleading inference, the jury would have known that Thorson had corroborated important aspects of Hodkiewicz's account when first contacted shortly after the alleged incident and, as importantly, the jury would have known that the state was caught trying to mislead it. . . . A jury knowing the state had tried to mislead it on one issue no doubt would be far more skeptical of its other evidence and desired inferences." (Docket # 15 at 35.) While it is possible that counsel's attempt to expose the state's allegedly misleading evidence might have helped Hodkiewicz, this is not clearly so. The jury might have concluded that the state had been trying to mislead them, but it also might have been struck by the problems with Thorson's statement. Thorson told police four days after the incident that he saw Hodkiewicz's exterior lights on between 7:00 and 7:30 p.m., that he then exchanged text messages with Hodkiewicz, that he saw the lights on in

Hodkiewicz's garage around 9:00 p.m., and that he went over to visit Hodkiewicz around 10:00 p.m. (Docket # 10-4 at 113.) This leaves obvious windows in which Hodkiewicz could have committed the assault. Furthermore, it is inconsistent with Thorson's statement at trial that he spoke with Hodkiewicz from approximately 8:30 p.m. to 10:00 p.m. Thus, it is not clear that counsel's rebuttal would have been helpful, let alone that it would have affected the outcome of trial.

Because the court of appeals' finding of no prejudice was reasonable, Hodkiewicz is not entitled to habeas relief on this claim.

### 2.6. *Cumulative Effect*

Hodkiewicz argues that the court of appeals ignored the cumulative effect of counsel's errors on the jury's ability to assess S.P.'s credibility, the undermining of which was central to Hodkiewicz's defense. Indeed, a petitioner may demonstrate that the cumulative effect of counsel's individual acts or omissions was substantial enough to meet *Strickland*'s prejudice test. *Williams v. Washington*, 59 F.3d 673, 682 (7th Cir. 1995) (citing *United States ex rel. Kleba v. McGinnis*, 796 F.2d 947, 958 (7th Cir. 1986); *Montgomery v. Petersen*, 846 F.2d 407, 412 (7th Cir. 1988)). But in this case, the court of appeals concluded that even the cumulative effect of counsel's claimed errors did not entitle him to a new trial (except on Counts 2 and 3). (Docket # 1-2 ¶ 56 n.10.)

The courts of appeals' determination that any cumulative effect of counsel's errors was not enough to warrant a new trial is not unreasonable or contrary to *Strickland*. It is true that credibility was important in this case, as there was a notable lack of physical evidence tying Hodkiewicz to these crimes. Nevertheless, the evidence of credibility was voluminous. The jury heard both S.P. and Hodkiewicz testify along with dozens of witnesses, many of whom

corroborated aspects of S.P.'s testimony and/or undermined Hodkiewicz's credibility. For example, medical professionals testified that S.P.'s injuries were suspicious for assault and could not have been self-inflicted. Multiple professionals—doctors, the domestic violence counselor, and probation officers—testified that Hodkiewicz engaged in passive-aggressive, confrontational, vindictive, and/or angry behaviors. Even if counsel might have somewhat undermined S.P.'s credibility or the state's case by doing everything Hodkiewicz suggests he should have—objecting to the TracFone activation testimony, the "special privileges" testimony, and the "work phone" testimony, and rebutting the "underground" testimony and the inference that Hodkiewicz and Thorson fabricated Hodkiewicz's alibi—that would have done little to undermine all the other testimony supporting S.P.'s credibility.

A state court decision passes habeas review "if [the court's conclusion] is one of several equally plausible outcomes." *Hall*, 106 F.3d at 748–49. Even if Hodkiewicz's attorney committed errors, the court of appeals' conclusion that these errors did not affect the outcome on most of the counts was not unreasonable or contrary to *Strickland*. Therefore, habeas relief is not available on this claim.

3.    *Double Jeopardy*

Hodkiewicz argues that his conviction for both strangulation and suffocation in violation of Wis. Stat. § 940.235(1) and bail jumping in violation of Wis. Stat. § 946.49(1) on the basis of the strangulation and suffocation crime violated the Double Jeopardy Clause of the Constitution. (Habeas Pet., Docket # 1 at 10.) Hodkiewicz asserts that because the elements of the strangulation offense are entirely included within the elements of the bail jumping offense, it is unconstitutional for him to be sentenced consecutively for both. (Docket # 15 at 36–39.)

The Fifth Amendment to the Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." This provision is notoriously difficult to apply, and "the [Supreme] Court's [double jeopardy] jurisprudence is complicated and often unclear." *Boyd v. Boughton*, 798 F.3d 490, 493 (7th Cir. 2015). The starting point is *Blockburger v. United States*, 284 U.S. 299 (1932). *Boyd*, 798 F.3d at 493. The *Blockburger* test asks whether each offense requires an element that is not required by the other: if not, then the two are the "same offense." *See Boyd*, 798 F.3d at 494 (quoting *Blockburger*, 284 U.S. at 304 ("[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact of which the other does not.")). "Put differently, if Statute 1 requires an element that Statute 2 does not; and Statute 2 requires an element that Statute 1 does not, then the statutes constitute different offenses. Otherwise, they are the same offense for *Blockburger* purposes." *Id.*

Although the *Blockburger* test sounds straightforward, its application has proved problematic. For one thing, even convictions that violate the *Blockburger* test might still not violate the Double Jeopardy Clause if the legislature intended separate punishments. *Boyd*, 798 F.3d at 501. "[S]imply because two criminal statutes may be construed to proscribe the same conduct under the *Blockburger* test does not mean that the Double Jeopardy Clause precludes the imposition, in a single trial, of cumulative punishments pursuant to those statutes." *Missouri v. Hunter*, 459 U.S. 359, 368 (1983). In such cases, "the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Id.* at 366. *See also United States v. Dixon*, 113 S. Ct. 2849 (1997) (prosecution for violation of civil protection order by committing offenses did not preclude

subsequent prosecutions for underlying offenses).

In *Boyd*, the Seventh Circuit painstakingly traced the Supreme Court's double jeopardy jurisprudence and applied it to Boyd's claim that conviction for an underlying offense and conviction under Wisconsin's bail jumping statute based on the same offense violated the Double Jeopardy Clause. The court pointed out that the lack of clarity in the Supreme Court's jurisprudence in this area is one reason Boyd's habeas challenge failed under AEDPA's deferential standard. *Id.* at 500–01 (noting that the justices in *Dixon* articulated five different interpretations of *Blockburger*). In other words, a state court decision cannot be contrary to or an unreasonable application of clearly established federal law if the Supreme Court has not clearly articulated the law, and it has not clearly articulated the law in this area. The *Boyd* court then explained that the Supreme Court of Wisconsin had concluded that the legislature intended that the bail jumping statute punish separate conduct (the act of violating a court order) from any underlying offense, and that therefore the district court's conclusion that the convictions did not violate the Double Jeopardy Clause was not unreasonable. *Id.* at 501.

In this case, the court of appeals rejected Hodkiewicz's double jeopardy claim because, as he conceded, it ran afoul of Wisconsin Supreme Court precedent. (Docket # 1-2 ¶ 65.) In his brief in support of this petition, Hodkiewicz concedes that Seventh Circuit precedent in *Boyd* is also contrary to his position, and states that he raises this claim solely to preserve it for appellate review. (*Id.* at 39.) Indeed, *Boyd* squarely rejects Hodkiewicz's argument that conviction under Wisconsin's bail-jumping statute and conviction for the underlying offense violates the Double Jeopardy Clause of the Constitution. 798 F.3d at 500–01. Because the Wisconsin Court of Appeals' decision was not contrary to or an unreasonable application of federal law, Hodkiewicz is not entitled to habeas relief on this ground.

## CONCLUSION

To obtain habeas relief, Hodkiewicz must show that the state court's decision was contrary to or an unreasonable application of federal law. Hodkiewicz's Ground One and Two claims are procedurally barred. Hodkiewicz has not shown that it was contrary to or an unreasonable interpretation of *Strickland* for the court of appeals to deny his Ground Three claim of ineffective assistance of counsel. Hodkiewicz's Ground Four claim of double jeopardy is contrary to Supreme Court precedent as interpreted by the Seventh Circuit. Accordingly, Hodkiewicz does not present any basis to grant relief under 28 U.S.C. § 2254. The petition will therefore be denied and the case dismissed.

## CERTIFICATE OF APPEALABILITY

According to Rule 11(a) of the Rules Governing § 2254 Cases, the court must issue or deny a certificate of appealability "when it enters a final order adverse to the applicant." A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, and n.4).

When issues are resolved on procedural grounds, a certificate of appealability "should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

Each showing is a threshold inquiry; thus, the court need only address one component if that particular showing will resolve the issue. *Id.* at 485.

Jurists of reason would not find it debatable that Hodkiewicz is not entitled to habeas relief. Thus, I will deny Hodkiewicz a certificate of appealability. Of course, Hodkiewicz retains the right to seek a certificate of appealability from the Court of Appeals pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that Hodkiewicz's petition for a writ of habeas corpus (Docket # 1) is **DENIED**;

**IT IS FURTHER ORDERED** that a certificate of appealability shall not issue;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 24th day of September, 2019.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge